IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE TRUST OF FAILLA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE TRUST OF VIRGINIA L. FAILLA, DECEASED.

ROXANN HALEY, APPELLANT,

V.

SALLY J. HYTREK, SPECIAL TRUSTEE, APPELLEE, AND STEVE FAILLA, DAN FAILLA,
AND VICKIE COONROD, INTERVENORS-APPELLEES.

IN RE ESTATE OF VIRGINIA L. FAILLA, DECEASED.

ROXANN HALEY, APPELLANT,

V.

SALLY J. HYTREK, SPECIAL ADMINISTRATOR, APPELLEE, AND STEVE FAILLA, DAN FAILLA,
AND VICKIE COONROD, INTERVENORS-APPELLEES.

Filed November 1, 2016.    Nos. A-15-687, A-15-688.

Appeal from the County Court for Douglas County: JOSEPH P. CANIGLIA, Judge. Affirmed in part, and in part reversed and remanded with directions.

Kathryn J. Derr for appellant.

Sally J. Hytrek, pro se.

John A. Svoboda and William J. Lindsey, of Gross & Welch, P.C., L.L.O., for intervenors-appellees.

- 1 -

MOORE, Chief Judge, and INBODY and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Roxann Haley appeals from the decision of the county court for Douglas County finding that she breached her fiduciary duty as attorney in fact for her mother, Virginia L. Failla, and entering judgment against her and in favor of the estate for $296,356.42. The judgment included $196,473.65 for excessive room and board; $578.80 for interest charges on a late payment when Virginia's home went into foreclosure; $40,838.31 for special administrator fees; and $58,465.66 in attorney fees incurred by Roxann's siblings who intervened in the proceedings. We affirm the judgment for $196,473.65 and $578.80, reverse and remand for modification the award for special administrator fees, and reverse and remand to vacate the award for the intervenors' attorney fees.

## II. BACKGROUND

Virginia died on February 20, 2012. She was the mother of Roxann, Vickie Coonrod, Dan Failla, and Steve Failla. On September 5, Roxann filed a trust action (case No. PR 12-1193 in county court, case No. A-15-687 on appeal), seeking to remove Dan as a cotrustee of the Virginia L. Failla Revocable Trust, claiming that he was frustrating her ability, as the other cotrustee, to perform the necessary fiduciary duties associated with the trust. On September 17, Dan filed an estate action (case No. PR 12-1247 in county court, case No. A-15-688 on appeal), claiming that a special administrator was necessary "to pursue a claim for recovery of funds from [Roxann] when she was acting under a Power of Attorney signed by [Virginia]." Dan's petition alleged that Roxann expended more than $416,000 of Virginia's funds during a 33-month period from May 2009 through February 2012.

In two separate orders filed on January 8, 2013, Sally J. Hytrek was appointed by the court as special administrator of Virginia's estate and special trustee of her trust. The order from the estate case appointing Hytrek as special administrator directed Hytrek to investigate any expenditure of Virginia's funds from May 1, 2009, through the date of the order, and further authorized Hytrek to commence any litigation that may be necessary to recover any funds for the benefit of the estate. The order from the trust case appointing Hytrek as special trustee authorized Hytrek to sell any and all assets of the trust, including any real estate.

On April 25, 2013, Hytrek filed an identical report in both cases indicating "that hundreds of thousands of dollars are missing from the estate during the time the Power of Attorney, Roxann Haley[,] had control of the estate." Hytrek noted other missing assets and the use of real property by Roxann's son without payment of rent or other costs associated with that property. Hytrek stated that she requested "a very specific accounting" from Roxann for the years 2009 through 2012, and "unless there is proof to the contrary, a Surcharge action against Roxann Haley is appropriate under the circumstances, and will be done by this Special Administrator."

Roxann provided the requested accounting, and on September 5, 2013, Hytrek filed an "Application for Surcharge" in both cases. Hytrek alleged that Roxann "used her position as [sic] Durable Power of Attorney to benefit her and her husband," and that this constituted self-dealing. Hytrek further alleged that Roxann "breached her fiduciary duty as the actions she undertook as

[sic] the Durable Power of Attorney were clearly not in the best interests of [Virginia's] estate; that she and her husband unduly influenced [Virginia] to sign agreements that were not in the best interests of the trust and her estate[.]"

On October 25, 2013, Dan, Steve, and Vickie filed a petition for intervention in both cases; the court granted their request to intervene on November 13.

Trial regarding the surcharge action took place on August 12, 13, 26, September 23, and November 19, 2014. Witnesses testified about Virginia's living arrangements, and the family dynamic between Virginia, Vickie and her husband (Kim Coonrod), Dan, Steve, and Roxann and her husband (Robert Haley). Numerous exhibits were also received. A summary of the evidence pertinent to the matter on appeal follows.

On November 27, 2008, Virginia suffered a serious stroke. Despite care and rehabilitation, the stroke rendered Virginia unable to care for herself or live independently. Virginia spent time in hospitals and nursing homes until she moved in with Roxann and Robert in May 2009. She lived with the Haleys until her death on February 20, 2012.

At the time of Virginia's stroke, Vickie's husband, Kim, was Virginia's attorney in fact under an October 10, 2008, power of attorney. Shortly after the stroke, Dan, Steve, and Roxann met to discuss Virginia's power of attorney. At that meeting, Roxann indicated her intent to take the power of attorney away from Kim. Virginia then executed three POA agreements over a 3-month period. On January 21, 2009, Virginia named Roxann and Dan as attorneys in fact. On January 28, Virginia signed another agreement that also named Roxann and Dan as attorneys in fact. Finally, on March 25, Virginia signed her last power of attorney and named only Roxann as attorney in fact; this power of attorney remained valid until Virginia's death.

Before Virginia signed the 2009 power of attorney documents, her treating physicians considered her unable to handle her personal financial and healthcare affairs. On December 5, 2008, Dr. J. Paul Cook of Lakeside Hospital hand wrote on a "Physician Orders/Progress Notes" form that Virginia was "unable to manage her own personal financial affairs - a status that will likely persist for some time, most likely for the remainder of her life[.]" Also, an unaddressed note dated January 6, 2009, and signed by Dr. Thomas A. Franco of Immanuel Rehabilitation Center, states that he had been treating Virginia "since she suffered a stroke" and that it was his medical opinion that she was "unable to handle her medical or financial affairs since suffering her stroke 11-27-08."

However, on January 16, 2009, Dr. Steve Hoody (Virginia's primary care physician since 1956) wrote a letter "To Whom It May Concern" regarding Virginia's stroke and progress. Dr. Hoody explained that since Virginia was admitted to a hospital at which he was not "on the staff," another primary care physician had been assigned to her during her hospitalization. He added, "Since then she has made progressive and significant improvement and is presently in an assisted living care facility[.]" Dr. Hoody also wrote that he talked by telephone with Virginia and Roxann, and that Virginia "wishes to have her power of attorney rescinded." It was his opinion that Virginia's power of attorney could be rescinded, "[i]f this opinion agrees with her current primary care physician[.]"

After moving in with the Haleys, Virginia lived in a room that the parties alternatively described as a walk-in closet or a den. Regardless, using the largest dimensions mentioned at trial,

Virginia's room was no larger than 10 feet by 10.5 feet. Roxann charged Virginia approximately $6,000 per month for room and board between May 2009 and February 2012. The $6,000 included $1,200 for 1/3 of the monthly mortgage, $203 for 1/3 of the monthly utilities, $50 for 1/3 of the garage space, $1,095 for food ($36 per day), $183 for meal preparation, $195 for laundry services, $45 for transportation, $150 for cleaning and supplies, and $2,879 for personal care from Roxann. Checks for these expenses were written by Roxann to herself or to "cash" from Virginia's account, signing the checks "Roxann Haley, POA." Robert testified that the $6,000 per month figure was based on his consultations with various nursing homes and healthcare providers. In addition to the monthly living expenses paid to Roxann, Virginia also paid the cost of her own in-home healthcare providers. According to exhibit 43 (prepared by Robert), the total amount paid out of Virginia's funds between May 2009 and February 2012 was $416,118.89.

Roxann collected $6,000 per month even when Virginia stayed at the hospital or nursing home. During the county court proceedings, Roxann said she demanded the full $6,000 when her mother was gone because her mother's attorney, Joe Byam, advised her to do so "because, just like a nursing home, the bed was saved, the room was saved."

Between May 2009 and November 2010, Roxann collected $108,000 in rent and associated costs without a written agreement with Virginia. In November 2010, 18 months after Virginia moved in with the Haleys, Robert prepared a written "Living Arrangement Agreement" defining living arrangements for Virginia at their home and indicating her consent to pay $6,000 per month for the items noted in the agreement. The monthly fee was to include housing, room cleaning, utilities, garage space, daily activities (physical therapy to be completed by other providers), transportation, daily personal care, hygiene, food/beverages, meal preparation, and laundry service. The agreement stated that it did not include day care providers (noting times of day care needed), required medications, hair salon services, prescribed supplemental vitamin drinks, night time products, and any food/beverage purchased outside the home for Virginia and her day care providers. Robert based this "Living Arrangement Agreement" on a document he found on the internet, but made some alterations. This agreement was to run from a backdated effective date of June 1, 2010, to June 1, 2011. Roxann and Virginia signed the agreement on November 24, 2010, but Robert did not.

Virginia's attorney, Byam, subsequently drafted a "Lease and Care Agreement" to replace the "Living Arrangement Agreement." Byam said that he prepared this more formal agreement after two telephone calls, one from Virginia in which she recounted a visit from Adult Protective Services, and one from Roxann, in which she informed him that Adult Protective Services suggested some sort of written agreement governing the living situation between Roxann, Robert, and Virginia.

The county court received two documents titled "Lease and Care Agreement" into evidence. The agreements are nearly identical and both are signed by Roxann, Robert, and Virginia. While the documents were supposedly signed on the same day, both display very different signatures from Virginia. Robert's explanation was that Virginia was left-handed and she had to sign with her right hand. In addition, one of the documents contains no signature date while the other displays a date of December 9, 2010. The undated document includes an attached detailed itemization reflecting a breakdown of the charges totaling $6,000; the dated document does not

have this attachment. Robert testified that both documents contained the attachment when signed, and that both documents were signed at the same time. The signed and dated "Lease and Care Agreement" ran indefinitely from month to month with a backdated effective date of January 1, 2010.

In addition to the financial elements of this case, the parties presented evidence regarding the strained personal relationships within the family. We highlight some of this evidence below.

On June 6, 2009, Roxann sent a letter to Dan, Steve, and Vickie detailing the proper procedures for visiting Virginia at Roxann's home. The letter stated that Roxann's agreements with home care providers prohibited these providers from allowing anyone into the home. Roxann requested that everyone schedule visits with Virginia at least 24 hours in advance. Dan, Steve, and Vickie also received an unsigned letter dated April 26, 2011. This letter stated that Dan, Steve, and Vickie could meet Virginia for breakfast each Sunday at 9:15 a.m. at a Hy-Vee restaurant in west Omaha, Nebraska. The letter also stated that either Roxann or a mediator would attend each breakfast.

Dan likened visiting his mother to visiting a "detention center" and said that visits consisted of "going over to Roxann's house and sitting there while she is standing guard." Vickie and Kim visited Virginia only once after she moved in with Roxann. The visit was short and, according to Vickie, unpleasant enough that Vickie refused to visit Virginia at Roxann's home again. Virginia's sister-in-law visited twice, and both times met with Virginia on Roxann's driveway.

Originally, Vickie and Steve were not permitted in Roxann's home without either herself or Robert present. Roxann testified that she excluded Steve "[b]ecause right before my mother came to live with me, Steve slugged me as hard as he could in my stomach at Hillcrest." When questioned, Roxann testified that Vickie was not permitted in the house alone "[b]ecause -- not to be trusted." Additionally, Dan said that while he was initially allowed to be in Roxann's home without either Roxann or Robert being present, over time, he found himself essentially unable to see or speak with Virginia without Roxann, Robert, or a mediator present.

A "Fact Sheet" from one of Virginia's stays at Hillcrest Health & Rehab lists only Roxann, Robert, and their son, Ross Haley, as contacts for Virginia. The words "no contact from anyone else" were handwritten on the sheet as well, in all capital letters. Roxann acknowledged that she might have written "no contact from anyone else" on the Hillcrest "Fact Sheet" but simultaneously denied directing anyone to write those words on the Fact Sheet. Roxann also denied prohibiting others from visiting Virginia.

On March 25, 2015, the county court entered the same order in both the estate and trust cases, finding in relevant part that: after her stroke, Virginia was unable to care for herself and was dependent on others for her daily care and hygiene; Virginia was a vulnerable adult; Roxann accepted appointment as an agent under the power of attorney on or about March 25, 2009; Roxann had a fiduciary relationship with Virginia by virtue of the power of attorney; Roxann isolated Virginia from her friends and children; Roxann instructed nursing home staff to prevent Vickie, Steve, and Dan from visiting Virginia; Roxann required her siblings to pay a mediator whenever they wanted to see their mother "which had a chilling effect" on their visitations; the accounting prepared by Roxann and her attorney contained "numerous entries which are not appropriate and excessive, including: [r]oom, [b]oard, [t]ransportation, [m]eals, [e]ntertainment, [t]herapy, [h]ome

care, [h]ygiene, [g]ifts and [l]oans to Ross Haley, auto and fuel expenses"; Roxann allowed her son to live in Virginia's house rent-free for 20 months and the house went into foreclosure resulting in $578.80 in interest charges on a late payment; Roxann breached her fiduciary duties as attorney in fact for her mother. The court found that the amounts for "Room and Board, etc." were $196,473.65; that the special administrator fees for the investigation and prosecution of the surcharge action were $40,838.31, and that they were necessary and fair; and that the intervenors "were required to expend monies to investigate and join in the prosecution of the [s]urcharge action" and their attorney's fees of $58,465.66 were necessary and fair, reasonable, and customary. The court entered judgment in favor of the estate and against Roxann "for amounts charged for room and board," for the special administrator's fees and intervenors' attorney's fees, and $578.80 for "interest charges on the late payment" when Virginia's home went into foreclosure. The total judgment entered against Roxann was $296,356.42.

Although the record contained evidence of other dealings and expenditures made by Roxann as Virginia's attorney in fact beyond the judgment entered (e.g., gifts and loans to Roxann's son, the fair rental value of Virginia's home, auto and fuel, and home health care), the county court did not include such expenditures in its judgment against Roxann. The county court denied Roxann's motion for new trial. Roxann now appeals to this court, and her two appeals were consolidated for briefing and disposition.

## III. ASSIGNMENTS OF ERROR

Roxann assigns, restated, that the county court erred by (1) concluding that she breached her fiduciary duties as attorney in fact for Virginia, (2) finding no express agreement for payment between Roxann and Virginia, (3) failing to find the agreement was in the best interests of Virginia, and (4) assessing attorney fees and costs against her in favor of the special administrator and intervenors.

## IV. STANDARD OF REVIEW

In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. *In re Estate of Watkins*, 243 Neb. 583, 501 N.W.2d 292 (1993). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Estate of Jakopovic*, 261 Neb. 248, 622 N.W.2d 651 (2001).

Statutory interpretation is a question of law that an appellate court resolves independently of the trial court. *Huntington v. Pedersen*, 294 Neb. 294, 883 N.W.2d 48 (2016).

## V. ANALYSIS

We first note that although the same order was filed in the estate case and the trust case, the final order on appeal in both cases pertains to the surcharge action initiated by Hytrek as special administrator in the estate case. All matters for which Roxann was surcharged pertain to her actions as attorney in fact for Virginia before her death, and not as a cotrustee of the trust. We conduct our review accordingly.

## 1. ROXANN'S BREACH OF FIDUCIARY DUTY
### AS ATTORNEY IN FACT

Roxann addresses the first three assignments of error noted above under two argument headings in her brief. First, she argues that all payments to Roxann while Virginia lived with her "were authorized under the power of attorney document and were made pursuant to an express agreement with [Virginia]." Brief for appellant at 10. Her second argument asserts that the "[p]ayments to Roxann for Virginia's care were in the best interests of Virginia." Brief of appellant at 12. We address Roxann's arguments in that order.

### (a) Power of Attorney and Express Agreement

In considering the applicable legal principles, we begin with the fundamental understanding that a power of attorney authorizes one person to act as the agent of another. See *Crosby v. Luehrs*, 266 Neb. 827, 669 N.W.2d 635 (2003). An agent is required to act solely for the benefit of his or her principal in all matters connected with the agency and adhere faithfully to the instructions of the principal. *Id.*

Absent an express intention, an agent may not use his or her position for the agent's or a third party's benefit in a substantially gratuitous transfer. *Archibald v. Reifenrath*, 274 Neb. 894, 744 N.W.2d 701 (2008). An attorney in fact, under the duty of loyalty, always has the obligation to act in the best interest of the principal unless the principal voluntarily consents to the attorney in fact engaging in an interested transaction after full disclosure. *Id.* The basic policy concern underlying the law that forbids self-dealing is primarily addressed to the potential for fraud that exists when an agent acting pursuant to a durable power of attorney has the power to make gifts, especially after the principal becomes incapacitated. *See Crosby v. Luehrs, supra.*

Several cases involving alleged wrongful conduct and self-dealing through the use of a power of attorney have been decided by our Supreme Court. See *Litherland v. Jurgens*, 291 Neb. 775, 869 N.W.2d 92 (2015). As noted in *Litherland*, our courts have long recognized that because of the agency relationship created by a power of attorney, the authority and duties of an attorney in fact are governed by the principles of the law of agency, including the prohibition against an agent profiting in transactions in which the agent represents the principal. *Id.* Because of these concerns, our courts have held that a party establishes a prima facie case of fraud by showing that an attorney in fact used the principal's power of attorney to make a gift of the principal's assets to himself or herself. See *id.* Whether the fiduciary acted in good faith or had actual intent to defraud is immaterial; when these circumstances are shown, the law presumes constructive fraud. *Id.* The significance is that the burden of going forward with evidence then shifts to the fiduciary to establish by clear and convincing evidence that the transaction was made under the power expressly granted in the instrument, the clear intent of the donor, and the fairness of the transaction. See *id.*

In addition to that burden for a fiduciary, where there is a familial relationship between the deceased and a claimant seeking compensation for services, the claimant must rebut by competent evidence the presumption that the services were rendered gratuitously. *In re Estate of Haddix*, 211 Neb. 814, 320 N.W.2d 745 (1982).

With these legal principles in mind, we now consider whether Roxann used her position as attorney in fact for her benefit or a third party's benefit in a substantially gratuitous transfer in violation of the prohibition against an agent profiting in transactions in which the agent represents the principal. Since there is evidence of a written agreement, Roxann must establish that the transaction was made under the power expressly granted to her, that it was made with clear intent by Virginia, and, importantly, she must prove the fairness of the transaction. Additionally, because of her familial relationship with Virginia, Roxann must also overcome the presumption that her services were rendered gratuitously.

Roxann argues that the power of attorney authorized her to enter into contracts and pay for Virginia's personal care; that payments to Roxann during Virginia's residence with her "were not self-dealing, were not unauthorized gifts, but were payments made for services with the express consent of Virginia." Brief for appellant at 9. Further, she states that "[t]he presumption that a child's services in caring for a parent were done gratuitously is not conclusive." Brief for appellant at 10.

Roxann first discusses in her brief why the services she rendered to her mother were not gratuitous. Citing to *In re Estate of Chalupa*, 134 Neb. 918, 280 N.W. 164 (1938) and *In re Estate of Baker*, 144 Neb. 797, 14 N.W.2d 585 (1944), Roxann asserts that "[t]he presumption is properly overcome through evidence from disinterest [sic] persons testifying about statements made by the decedent referring to an agreement to pay the child, and/or from documentary evidence of the same." *Id*. Roxann claims that "it is uncontroverted that [Virginia] did not want to live in a nursing home, and that she was not able to return to her own home due to her physical limitations." Brief for appellant at 11.

Roxann claims that the "Lease and Care Agreement," along with witness testimony, sufficiently rebuts the presumption of gratuity in this case. She relies on *In re Estate of Chalupa*, 134 Neb. 918, 280 N.W. 164 (1938) (presumption of gratuity for services rendered overcome when daughter of decedent produced memorandum signed by father agreeing to payment for services, along with testimony of two disinterested witnesses), and *In re Estate of Baker*, 144 Neb. 797, 14 N.W.2d 585 (1944) (presumption of gratuitous services for work performed by nephew managing uncle's farm operations overcome by uncle's public statements and actions before death and weaker familial relationship). Roxann contends that Virginia orally agreed to pay the Haleys to live with them, the "oral agreement was ratified in the written document," and that "[n]either the siblings nor the special administrator presented evidence that Virginia did not intend to pay Roxann" while living with her. Brief for appellant at 11. She also claims that Dan was paid when he took care of Virginia while Roxann was away, that Dan was aware of the payment agreement and did not complain until after Virginia died, and that none of the siblings disapproved of the care she gave Virginia.

Roxann concludes her argument on this issue by asserting that the county court erred by "failing to find an express agreement" between herself and Virginia, and by finding that "Roxann breached her fiduciary duty to Virginia" by receiving the payments at issue. Brief for appellant at 12. Roxann's entire argument in opposition to the $196,473.65 judgment (for room and board) entered against her appears to be that since there was a written agreement, she has overcome the presumption that she provided the services to Virginia gratuitously, and she is therefore permitted

to be paid the amounts set forth in the agreement. However, even assuming Roxann may have overcome the presumption of gratuitous services because of the existence of an agreement, such a finding would not mean the county court had to ignore the other evidence that she used her position as attorney in fact for her personal or a third party's benefit by making substantially gratuitous transfers. See *Archibald v. Reifenrath*, 274 Neb. 894, 744 N.W.2d 701 (2008). In other words, simply because Roxann was able to present a document alleged to be signed by Virginia setting forth payments to be made to Roxann for Virginia's care does not by itself preclude a fact finder from determining that the terms within the document constituted self-dealing and resulted in gratuitous transfers from Virginia's funds. As noted above, self-dealing is prohibited to address the potential for fraud that exists when an agent acting pursuant to a durable power of attorney has the power to make gifts, especially after the principal becomes incapacitated. See *id*.

There is nothing in the county court's opinion to indicate that the court failed to find an express agreement, as Roxann alleges; rather, the court is silent as to the agreement. The court does, however, specifically find that there were inappropriate and excessive expenditures by Roxann acting as Virginia's attorney in fact. Notably, the court found that Virginia's stroke "profoundly disabled her," that "[s]he was dependent on others for her daily care and hygiene," and that she "was a vulnerable adult." The court also found that Roxann was "appointed as agent under Durable Power of Attorney signed by Virginia L. Failla on March 25, 2009," and that Roxann accepted the appointment by taking action under the power of attorney. The court then noted that Roxann had a fiduciary relationship with Virginia because of the power of attorney, and that while Roxann "was the [a]ttorney-in-fact for her mother," she isolated Virginia from her other children and friends, prevented the other children from seeing Virginia while she was at a nursing home, and required them to pay a mediator whenever they wanted to see Virginia "which had a chilling effect" on their visits with her.

The court went on to discuss the accounting which contained "numerous entries which are not appropriate and excessive including: [r]oom, [b]oard, [t]ransportation, [m]eals, [e]ntertainment, [t]herapy, [h]ome care, [h]ygiene, [g]ifts and [l]oans to Ross Haley, auto and fuel expenses." The court noted that Roxann allowed her son, Ross, to live in Virginia's home "rent-free for 20 months," and the fair rental value of the home was $1,200 per month. Further, while Ross was living there, the home "went into foreclosure and interest charges on the late payment amounted to $578.80."

The court concluded that Roxann breached her fiduciary duty as attorney in fact for Virginia and entered judgment in favor of the estate and against Roxann for $196,473.65 "for room and board[.]" Although Roxann expended more than $400,000 from Virginia's funds, the county court determined that, other than the $578.80 (foreclosure interest), only the charges for room and board were not appropriate; these would have been the charges arising from the "Lease and Care Agreement" which charged Virginia $6,000 per month to live with the Haleys. The court specifically found that the charges were "not appropriate" and that they were "excessive." Roxann failed to prove otherwise. See *Litherland v. Jurgens*, 291 Neb. 775, 869 N.W.2d 92 (2015) (fiduciary bears burden of proving fairness of transaction).

We conclude that the court's silence as to the written agreement has no meaningful impact on its judgment entered in favor of the estate and against Roxann for $196,473.65 (and $578.80)

because its conclusion that Roxann breached her fiduciary duty by paying herself inappropriate and excessive amounts for Virginia's care conforms with the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. We affirm this portion of the order.

(b) Virginia's Best Interests

Although we have already determined the county court did not err in entering judgment against Roxann for Virginia's room and board charges (and foreclosure interest charges), for the sake of completeness, we address Roxann's "best interests" argument since the law does recognize that an attorney in fact may be able to personally benefit from the principal's funds in certain circumstances.

The law recognizes the manifold opportunities and temptations for self-dealing that are opened up for persons holding general powers of attorney. *Cisneros v. Graham*, 294 Neb. 83, 881 N.W.2d 878 (2016). However, loyalty to the principal can be compatible with an incidental benefit to the agent; thus a best interest test is favored over a sole interest test on the grounds that most agents under powers of attorney are family members who have an inherent conflict of interest with the principal. See *Id*.

Roxann argues that "while payments to Roxann did reduce the funds available for distribution upon Virginia's death, the same would be true if Virginia had lived in a nursing home during that time," that Virginia did not want to live in a nursing home, and that no one disputes Roxann "provided a beneficial service to Virginia in a loving home environment" until her death. Brief for appellant at 16. She claims that the payments made to her were "fair and reasonable," because the evidence showed that while Virginia lived in a nursing home, she paid approximately $325 per day, or $9,885 per month; whereas Roxann was paid "substantially less" at $6,000 per month. Brief for appellant at 15. She notes that one of the estate's witnesses, an attorney, testified that family members are typically paid $300 per month, but Roxann argues that this is based on Medicaid allowances which are not relevant to private contracts between a parent and child. Roxann states she did not engage in self-dealing when making the express agreement with Virginia, and that "Virginia was in full and complete control of her mental facilities" after March 2009, "even though she had physical impairments from her stroke." Brief for appellant at 13.

Roxann goes on to distinguish her circumstances from those cases where courts have found self-dealing by an attorney in fact. She argues that "there is no evidence that Roxann used the power of attorney to alter the distribution of Virginia's property under her will or trust agreement." Brief for appellant at 14. Further, "any assumption or claim that that [sic] Roxann unduly influenced Virginia is negated by the fact that two separate investigations by Adult Protective Services found no wrongdoing by Roxann," and "[i]t was Adult Protective Services' suggestion that the payment arrangement between Roxann and Virginia be put in writing." *Id*.

The evidence does not support Roxann's assertion that the payments made to her were fair and reasonable because Roxann would have paid $9,885 per month in a nursing home, whereas Roxann was paid "substantially less" at $6,000 per month, brief for appellant at 15, and that "Virginia would have paid much more to a nursing home than she did while living with Roxann," reply brief for appellant at 5. If we take the total amount ($416,511) spent by Roxann over the

course of the approximately 33 months Virginia lived with her, that equates to $12,621 per month, which is higher than Roxann's estimated cost for nursing home care.

Further, the attorney who testified for the estate had 33 years of experience in elder law, and had "training on recognizing exploitation and adult abuse cases, looking for red flags, financial exploitation, and physical abuse, . . . and what to look for when . . . doing a forensic accounting review." The attorney reviewed depositions (including Roxann's), medical documents, the accounting, and some care giving exhibits. The attorney answered affirmatively when asked if anything in the accounting raised any red flags, and stated that "[a] red flag would be anything that I would see in an accounting that made me question whether or not that was an expenditure by the principal or for the benefit of the principal . . . and you would have to look into, see whether or not that was a legitimate expense or not, because on the face of it, it would not appear to be legitimate." The attorney noted that one red flag was that "even though there [were] descriptions of significant functional limitations, there [were] a lot of restaurants . . . quite a few charges at home improvement stores like Menards and Lowes." The attorney flagged a loan paid to someone other than the attorney in fact, and took notice of the amounts of money Roxann was paying herself. It was "suspicious or unusual" that payments were made in cash rather than by check, and if Roxann "had control of her mother's money, I wasn't clear as to why she needed to be reimbursing herself so frequently." The attorney testified that the average amount a family member typically asked for room and board "ends up being somewhere between [$]300 and $600." The attorney testified that $6,000 per month was not fair and reasonable, and that "[i]t's not typical at all" for children to get compensated for taking care of their parents; "it's not that that it never happens, but it's certainly not typical."

It was alleged that Roxann expended more than $416,000 of Virginia's funds during a 33-month period from May 2009 through February 2012. Of that amount, judgment was entered against Roxann for $196,473.65. There were numerous incidental benefits to Roxann and her family that were not included in that judgment, such as gifts and loans to Roxann's son, the fair rental value of Virginia's home, auto and fuel, restaurant charges, use of vehicles, miscellaneous credit card charges, and others. The county court must have determined those expenditures were made in Virginia's best interests and did not constitute self-dealing by Roxann. However, as discussed previously, there was competent evidence to support that the $6,000 per month room and board charges were excessive and not in Virginia's best interests.

## 2. FEES

The county court awarded fees to the special administrator and the intervenors; no statutory authority or uniform procedure was cited. The court's March 25, 2015, order states, "As a further result of [Roxann's] breach of fiduciary duty, the Estate was required to expend monies to investigate and prosecute the Surcharge action. The Special Administrator fees for the investigation and prosecution of the Surcharge action of $40,838.31 were necessary and are fair, reasonable and customary." The court concluded the same with regard to the intervenors and awarded them an attorney's fee of $58,465.66. Judgment was entered in favor of the estate and against Roxann for these amounts.

Roxann argues there is no statutory or uniform procedure to allow for the recovery of attorney fees incurred by the intervenors or the special administrator. It is true that the general rule in Nebraska is that an attorney fee may be recovered only when authorized by statute, or when a recognized and accepted uniform course of procedure allows recovery of an attorney fee. *Rosse v. Rosse*, 244 Neb. 967, 510 N.W.2d 73 (1994). We have previously determined that there is no statutory authority or uniform course of practice which would allow attorney fees to be awarded in a surcharge action against a former personal representative. See *In re Estate of Snover*, 4 Neb. App. 533, 546 N.W.2d 341 (1996). In the present action involving a breach of fiduciary duty by an attorney in fact, neither party has provided any authority for such fees except as may be allowed under the Nebraska Uniform Power of Attorney Act, Neb. Rev. Stat. § 30-4001 et seq. (Cum. Supp. 2014) (Nebraska UPOAA). When an agent violates the Nebraska UPOAA, § 30-4017(2) permits an award of costs and expenses, including reasonable attorney fees to any party, to be paid by another party, when justice may require. However, the Nebraska UPOAA only became effective January 1, 2013; therefore, Roxann claims the Nebraska UPOAA does not apply because the actions complained about took place prior to Virginia's death in February 2012. We examine the intervenors' award and the special administrator's award separately to determine whether authority exists to allow such fees.

(a) Intervenors' Attorney Fees

As noted above, § 30-4017(2) authorizes a court to award reasonable attorney fees, costs, and expenses to any party, to be paid by another party, if an agent violates the Nebraska UPOAA. However, Neb. Rev. Stat. § 30-4045 states:

> Except as otherwise provided in the Nebraska Uniform Power of Attorney Act, on January 1, 2013:
>
> (1) The act applies to a power of attorney created before, on, or after January 1, 2013;
>
> (2) The act applies to a judicial proceeding concerning a power of attorney commenced on or after January 1, 2013;
>
> (3) The act applies to a judicial proceeding concerning a power of attorney commenced before January 1, 2013, unless the court finds that application of a provision of the act would substantially interfere with the effective conduct of the judicial proceeding or prejudice the rights of a party, in which case that provision does not apply and the superseded law applies; and
>
> (4) An act done before January 1, 2013, is not affected by the act.

The language of a statute is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Cisneros v. Graham*, 294 Neb. 83, 881 N.W.2d 878 (2016). The plain language of § 30-4045(4) states that any "act" done before January 1, 2013, is not affected by the act (Nebraska UPOAA). Because the acts committed by Roxann in breach of her fiduciary duty to Virginia as her attorney in fact occurred before Virginia's death in February 2012, the Nebraska

UPOAA does not apply and cannot provide the necessary statutory authority to support the court's $58,465.66 judgment against Roxann for the intervenors' attorney fees.

The appellees' argue that § 30-4045 "clearly applies to judicial proceedings commenced after January 1, 2013," and that the petition for surcharge was filed September 5, 2013, and the intervenors petitioned to intervene in November 2013. We agree that the Nebraska UPOAA can apply to proceedings commenced after January 1, 2013, see § 30-4045(2), just as it can apply to proceedings commenced before January 1, 2013, see § 30-4045(3), and to powers of attorney created before January 1, 2013, see § 30-4045(1).

However, our general rules of statutory interpretation require an appellate court to give effect to the entire language of a statute, and to reconcile different provisions of the statutes so they are consistent, harmonious, and sensible. *Huntington v. Pedersen*, 294 Neb. 294, 883 N.W.2d 48 (2016). A court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless. *Id*.

Applying those rules here, we cannot ignore the very specific language of § 30-4045(4) which states that "[a]n act done before January 1, 2013, is not affected by the act." To reconcile this language with the other provisions of the statute so it is consistent, harmonious, and sensible, we can only conclude it means what it says. Since the other provisions of the statute allow the Nebraska UPOAA to apply to powers of attorney created before January 1, 2013, and to proceedings commenced prior to that date, it would have been unnecessary to add subsection (4) if all actions occurring under such instruments and proceedings prior to that date were intended to include specific "acts." Accordingly, the only meaning that can be drawn from subsection (4) is to exclude specific "acts" committed prior to that date, exactly as it says.

There being no statute or recognized and accepted uniform course of procedure to allow the intervenors to recover an attorney fee from Roxann, we reverse and remand the attorney fee judgment entered against Roxann in the amount of $58,465.66, with directions to vacate this portion of the judgment.

(b) Special Administrator's Fees

The county court also entered judgment against Roxann in favor of the estate for Hytrek's fees as special administrator in the amount of $40,838.31. Like the attorney fee award discussed above, this judgment cannot be supported by the Nebraska UPOAA. And although there is statutory authority for a special administrator to be awarded reasonable compensation for services rendered, we can find no authority that permits assessing such fees against another party.

A special administrator appointed by the court in any formal proceedings has the power of a personal representative, absent any specific restriction by the court. See Neb. Rev. Stat. § 30-2460 (Reissue 2008). See, also, Neb. Rev. Stat. § 30-2209(33) (Cum. Supp. 2014) (personal representative includes . . . special administrator). A personal representative is entitled to reasonable compensation for services. See Neb. Rev. Stat. § 30-2480 (Reissue 2008). If any personal representative or person nominated as personal representative defends or prosecutes any proceeding in good faith, whether successful or not, the personal representative is entitled to receive from the estate necessary expenses and disbursements, including reasonable attorney fees incurred. See Neb. Rev. Stat. § 30-2481 (Reissue 2008). In summary, a special administrator has

- 13 -

all the powers of a personal representative and may receive compensation for services, including attorney fees, when prosecuting any proceeding in good faith.

Given the county court's decision and our affirmance regarding the judgment against Roxann in favor of the estate for the room and board (and foreclosure interest) charges, it cannot be disputed that the surcharge action was brought in good faith; Hytrek was entitled to be compensated. And when an attorney fee is authorized, the amount of the fee is addressed to the trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion. *In re Estate of Chrisp*, 276 Neb. 966, 759 N.W.2d 87 (2009). We find no abuse of discretion in the county court's determination as to the special administrator's fee of $40,838.31.

However, we can find no authority, nor has any been provided to us, that would permit assessing the special administrator's fee directly against Roxann. Rather, § 30-2481, states that the personal representative is entitled to receive such fees "from the estate"; it says nothing about recovery from another party. Therefore, we affirm the judgment amount for Hytrek's special administrator fees, but reverse and remand this portion of the order with directions to vacate the $40,838.31 judgment against Roxann, and enter judgment for the special administrator's fees consistent with § 30-2481.

## VI. CONCLUSION

Of the total judgment entered against Roxann for $296,356.42, we affirm the $196,473.65 for "room and board" and the $578.80 for late payment interest charges when Virginia's home went into foreclosure. We reverse and remand the award of intervenors' attorney fees in the amount of $58,465.66, with directions to vacate this portion of the judgment entered against Roxann. We affirm the amount awarded for Hytrek's special administrator fees, but reverse and remand this portion of the order with directions to vacate the $40,838.31 judgment entered against Roxann for such fees, and to enter judgment in this amount for the special administrator's fees consistent with § 30-2481.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.